24-8024, Custodia Bank v. Federal Reserve. Mr. Gershengorn. Good morning, Your Honors, and may it please the Court, Ian Gershengorn on behalf of Custodia Bank. I'd like to reserve three minutes for rebuttal. In the Monetary Control Act of 1980, Congress provided that covered services, including services like master accounts, quote, shall be available to non-member depository institutions. For more than 35 years, in both statements and actions, the Fed and the Federal Reserve Banks implemented this unambiguous congressional command, never denying a single master account to an eligible institution. Now the Fed has initiated a review. During that time, did they ever say, we're not denying it because we don't have discretion, it's automatic, or did they say, exercising our discretion, we're not denying it? They didn't say the latter. But did they say the former? Your Honor, I think what's fair from the record to say over and over is that, A, they denied everyone. B, repeated statements from both the Federal Reserve Banks and from the Fed said that this was open to everyone. And third, they were making their decisions off a one-page form. That form asked for name, address, and contact information. So I think the record is very clear that for 35 years, the Fed acted as if and said that it had no discretion. Now I think what's happening here is there's essentially a rearguard action by the Fed to seize the power that Congress never gave it, asserting the authority to pick winners and losers as part of, as new banks enter the market, and essentially overruling state regulatory decisions. But as Judge Bachrach recognized, that newfound power cannot be squared with the plain text. Judge Bachrach didn't have the benefit of the amendment, the Toomey Amendment. How should we be thinking about that? So, Your Honor, I think the Toomey Amendment doesn't change anything. So first, the Toomey Amendment is recognizing that in the real world, Congress, the Fed, was denying, was rejecting applications. So when Congress asks for information on bank robberies, arsons, and murders, it's, of course, not saying that those things are lawful. It's asking for information on them so that it can legislate and so that it can have hearings. In fact, I think it would be quite an unfortunate policy consequence if this Court were to decide that by gathering information, that Congress therefore blessed perhaps an unlawful interpretation by an agency. And indeed, I think in this case, it would be particularly unfortunate to do so because of the historical context of the Toomey Amendment. Remember, what was happening there was that the Fed had revoked the charter, revoked the master account of reserve trust, and the Senate Banking Committee asked for information on the rejection, and the Fed said, pound sand. And so what Congress then said was, no, we're not accepting that. We want information. And indeed, at the very time Congress was asking for the, was passing a statute requiring information on rejections, members of the Senate were actually filing an amicus brief in our case saying what the Fed and the Federal Reserve Bank were doing was unlawful. So does reject mean rejection at the threshold for ineligibility? Is that all it means? No, Your Honor. I think what reject means is, tell us what you are actually doing in the real world. In the real world, remember, as this Court was well aware, the Fed and the Federal Reserve Banks had rejected the application of Fourth Corner. That's what gave rise, of course, to Judge Bachrach's opinion in this Court, opinion in the case arising in this Court. It had revoked the master account from reserve trust. So rejections were happening in the real world. It's therefore no surprise that the Toomey Amendment said, we want information on, basically, for grants pending and rejections, not because they were unlawful, but because they were actually happening. Congress has to be able to gather information about things that agencies are doing without blessing it. If Congress were to say to the executive branch, give me all examples that you have defied congressional subpoenas, nobody would think that Congress was blessing the executive branch position of not responding fully to subpoenas. I thought one of the stronger arguments, I thought, for the defendants was that Section 342 was directed to banks and 248 was directed to the board. And since you're a bank and it's more logical to find the source of authority here in a provision directed at the bank, how do you square or respond to that argument? So, Your Honor, I think the way I respond to the argument is I'd like to give a specific response and then kind of a structural response. So the specific response is that the command in Section 248 is not directed to the board. It says, all Federal Reserve Bank services shall be available to non-member depository institutions. It is correct, of course, and this is the structural point, that 342 generally gives the Federal Reserve Bank some authority to accept deposits. But I think that is the background legal authorization that gives the Federal Reserve Banks the ability to take deposits. It's not the be-all and end-all. If Congress passed a statute that said, for example, no master account shall be available to a bank owned by a foreign adversary, nobody would think that 342 overrode that and gave the Fed or the Federal Reserve Bank's discretion. It's a general provision making it legal for the Federal Reserve Banks to take deposits. But of course, that general provision is subject to subsequent amendments and subsequent clarification, which is exactly what Congress did. And the way you know that, Your Honor, is that this was the deal from the Monetary Control Act. What happened at the time of the Monetary Control Act is that banks were leaving in droves because the reserve requirements were different for banks in the federal system. So what Congress did was it put uniform reserve requirements, but in return, it guaranteed all banks, including the non-member banks, access to certain covered services, the bare minimum services that Congress thought was necessary in order to compete in the banking level. And so the whole system makes good sense, whereas the Federal Reserve undoes that bargain and is quite at odds with 35 years of statement after statement that these services will be available. Under your interpretation, then, the bank has a mandatory non-discretionary obligation to grant a master account without evaluating risk factors and the potential threat, harm, whatever, to the Federal Reserve system. It seems like the bank ought to be able to evaluate some of those factors before, you know, bringing a new actor into the system. So, Your Honor, I'm glad you raised that because I really do think their argument isn't a statutory construction argument. It is a, what I would call, a scare tactic about risk. And so let me say a few things about risk because I really think that gets to the heart of the case. First, for 35 years, the Fed managed risk to the system without ever denying a master account, and after repeated statement after repeated statement that these services were available to all. Second, 248C itself addresses risk. Congress was not oblivious to this. What Congress said was all services shall be available except that non-member banks shall be subject to other terms, including a requirement of balances sufficient for clearing purposes. So Congress addressed risk in the statute and didn't say deny master account. Third, master accounts, I think it's really important for the Court to sort of understand what master accounts are and aren't. Master accounts are like an entrance fee. They are not the keys to the kingdom, right? They are the, what allow the minimum basic services that allow banks to compete. And, of course, the Fed has plenty of tools to deal with master accounts. It's like your- Could the bank grant the master account and then refuse to accept deposits under 342? I don't think, so under 342, it has discretion to deny, to accept deposits except where that would undo Congress's judgment that you need to have the services available that are listed in 248B. So Congress made a substantive judgment those services would be available. The Fed and the Federal Reserve Banks cannot, by subterfuge, eliminate access to those services, but they can do, as part of the risk management, whatever they can do to member banks. And so I'd like to just continue the risk point, if I could, because I think it's really important. Like the master account is like your, they have all the tools that are available for your debit account, right? They can prevent overdrafts. They can require minimum balances. They can require collateralization. So the risk posed by the master account is fully protectable and more broadly, right, the broader risks to the system are covered by tools that came out in discovery that are in the record and it's no surprise, right? The Fed every day and for 35 years has been protecting the system from systemic risk without denying a single master account. That's because they have a plethora of tools to do that, all of which are in the record. And of course, states are available and states are the key regulators in the dual banking system. So I'm curious, if they've never denied a master account, why didn't you add account and claim of abuse of discretion here that, that I was intrigued that you went for the whole enchilada and you didn't ever ask for that abuse of discretion? So Your Honor, we didn't. And you know, that was the litigation judgment. We think the statute is crystal clear. I will say, as Your Honor is well aware from the Bank of San Juan litigation, the position from the Fed and the Federal Reserve Bank is that discretion is completely unreviewable, a position that Judge Kodal accepted in the Southern District of New York. So like, I really do think we find ourself, you know, kind of in a, between a rock and a hard place on this. But we did, I think in Judge Bachrach's opinion, I think kind of lighted the way for us on this. He had all, he had, he had... But that opinion was not an opinion for the court, as I understand. No, no, no, Your Honor. I'm not saying this court is bound by it. He was the only judge who reached the merits. Right, right. But he's the only Court of Appeals judge ever to have reached the merits, and he went our way on this. I mean, I think respectfully, what is going on, I think, is actually not risk, and it's not statutory construction. It's a frustration by the Fed and the Federal Reserve Banks about Congress's refusal, in some ways, or, you know, the absence of congressional regulation of crypto. I mean, I think you see this in Judge Bibas's opinion in the Third hasn't addressed crypto. Although they've denied master accounts in the Bank of San Juan was, is not a crypto case.  And pay services in Idaho is not a... No, Your Honor, they're not. But they, I think it's all of a piece, if you look at Fourth Corner and this case. I think what there is, is a sort of frustration at, in the crypto community, that the Federal regulators haven't addressed that. But that is not for the Federal Fed. That is not for the Federal Reserve Banks. Is there a difference between thinking about risk and thinking about something that is truly illegal conduct, you know, money laundering and the like? I mean, I'm trying to discern a limiting principle, and your argument does not lend itself to one. It's an absolute entitlement argument, and I'm trying to see if there's any daylight between thinking about risk here and your proposal or your argument that there is mitigation measures for risk that don't have to do with, you know, denying master accounts at the outset. And any reason a state charter bank could be denied a master account if it's engaging in illegal conduct. So, Your Honor, I don't think... So, of course, Judge Bachrach's opinion addresses that and says in the... So, A, we are subject to all the anti-money laundering statutes, and, and, of course, the Fed could, you know, revoke the account for us, as they do for the member banks. You know, TD Bank just settled a $3 billion case about the anti-money laundering statutes. They didn't revoke the master... They didn't prevent a master account. They have the tools to deal with that. Second, with respect to kind of the core question about, you know, whether you need to go as far as Judge Bachrach went, we don't think so, but, but sort of neither here nor there for our case, which, of course, is entirely legal activity and subject to the anti-money laundering statutes under Wyoming law and, and under federal law. And that is to say that, you know, we think you could, Judge Bachrach didn't, we think you could read the statute in the context of all the other federal statutes to say that when other federal conduct has made it illegal, for example, in the cannabis context, that the statute doesn't require it. But we sort of think that's a situation this court could leave unaddressed, given that what our conduct is, is entirely legal. I see I'm leading into my rebuttal. I'd love to answer the court's questions. One of the things you, you said in answering my question was the ability to revoke an account. So, so should we be thinking about the ability to revoke differently from the, the, the, the grant of the, the master account at the outset? Absolutely, Your Honor. The grant at the outset is what Congress required. What Congress said was it shall be available. It also said that you are subject to the same, to the same tools or subject to the same provisions that the member banks are subject to. So just like if you commit unlawful activity, of course. Let me just follow up with this one question. So under your position then, let's say that there was some reason to think after your master account was granted that the, your client's business model or some other factor, perhaps under the newly issued guidelines, was a cause for concern. Could they revoke, the Fed revoke the account the next day? I think that they were, well, so I don't, so that's a complicated question. Let me explain how I think about it. I think that they could revoke for changes in circumstances just as they could for a member bank. Your question was, if, if what you're asking is could they grant on day one and then with no change in circumstances revoke on day two? I think the answer to that is no, but because that is effectively undoing 248 A.C., right? That's just a sham. Like, so no, I don't think they could grant on day one and then say, aha, we're revoking on day two because if there's a mandatory duty as we claim there is, you can't, you can't undo that the next day by just pretending and then saying, you know, we had it all along. But if they came across anti-money laundering, you know, violations of the anti-money laundering statute, of course they could take steps just like they did against TD Bank and just like they do every single day and have for the last 45 years since the Monetary Control Act, take whatever steps are needed to protect the system from wrongdoing. What we're saying is a very limited but important thing. What Congress thought was that these were essential services, what they said in the House report, to require a basic level of services to let the new non-member depository institutions compete at a fair level. And of course the Fed has tools to deal with the master account just like they do with your, with your bank account. And of course they have a whole plethora of other tools that are completely untouched. I'll give you some rebuttal time, but as I understand the custodians' business model, you're going to be a depository institution for cryptocurrency and you also hold some cash, and it doesn't look like there's much interaction between those concepts. What value does a master account have for a bank like Custodia that's going to hold 100% reserves for the cash deposits? What do you need the master account for? It's essential, Your Honor, for all of the things that banks do. For example, wiring, you know, sort of essentially the bank-to-bank things, right? Wiring, cash transactions, settling deposit accounts. I mean, what we are providing is the full range of banking services to crypto, depository services to the crypto industry. And what the record shows is that this is essential for allowing us to do things like, you know, wire transfer services, if there were access. And the record is clear that without that, we can't function as the bank, as Judge Morse. I understand that if somebody comes in, a depositor or client of your bank with crypto, and they say, now we'd go out and we'd like to buy something with cash, your bank provides the services of taking their crypto account and converting that to cash and then transferring it out. Is that wrong? No, Your Honor, that is not right. What we are doing is a place like Coinbase makes sales. It makes money. It makes a couple million dollars. It needs some place to put that money. It gives that money to us. We don't convert the cryptocurrency into cash. We take the cash and hold it for them. And we then allow them to transfer. They could wire it to their employees, for example, for payroll. They could send it to another company, like as Your Honor surely do with your bank accounts, to wire money away. We are not in the business of exposing ourselves personally to investments in crypto. No, that's not what I said. I think what you just said is what I understood it to be. But never mind, we're already well into your time. Let's not pursue that any further. Okay. But the key thing there, I think, is that like the business model we have under Wyoming law is that we are basically holding the cash and providing the banking services to the crypto industry, right? And that's the core of our business. You've asked for a remedy of mandamus here, but you did not name the KC Fed president. To whom would a mandamus order be directed? So, Your Honor, a couple of things on that. I mean, our big picture point on mandamus, before I get to Your Honor's specific point, if I could, is like we have named the, we've sought mandamus against the board. We've sought APA against the board. We've sought mandamus against the Federal Reserve Bank of KC. And then to get to Your Honor's specific point, in paragraph 89 of the amended complaint, we say that the Kansas City Fed's president is an officer of the United States and thus is also subject to the court's mandamus power. So like we have covered the waterfront here, right? And it's like the only way mandamus isn't available or review isn't available is if there's, assuming a mandatory duty, is if that mandatory duty is unavailable. And even my colleagues don't assert that to be the case. They recognize that if there's a mandatory duty, relief would be available. So I think that it's not uncommon in the mandamus context to actually just sue an agency. And the Rothman decision that we cite in the Fourth Circuit says it expressly. The Fed might be an agency, but the bank probably isn't. Although, I think the Fed's disclaiming any authority to force the bank to grant the master account, right? Yes, Your Honor, but what the Fed, the Federal Reserve, the KC Fed has said over and over in its pleadings is that if there's a mandatory duty, we'll get it. But could I explain the mandamus against the Fed? It's like in the nature of a mandamus. What the Rothman case said and what the common law made clear is that mandamus is available or relief, I would be more precise and say relief in the nature of mandamus, is available against a private corporation with a public duty. The Supreme Court case, which we cite in our brief, Northwest Pacific Railroad, is a common situation, right? You had a railroad subject to a statutory duty to build a line or maintain a bridge. The common law allowed a writ of mandamus or the equivalent to run against that corporation. So I think the way we see it against the Fed is it doesn't matter whether, I'm sorry, against the KC Fed. We don't, it doesn't matter whether the KC Fed is an agency or a private corporation. It has a public duty under the statute to act, which is, which is enforceable under a writ or under an action in the nature of mandamus. Now with respect, you know, whether we also then identified in paragraph 89 of the amended complaint the KC Fed president. And as I said, said it's an officer of the United States and also subject to the court's mandamus power. So like whether you view it as a writ against the corporation and whether it is a private corporation or an agency or whether it's against the president, like we're covered. And indeed the Rothman decision, again, we cite in our brief from the Fourth Circuit, says like if you bring a writ of mandamus or the equivalent, against a corporation, but don't name the CEO, that's sufficient. Like, and so, and there are lots of cases from this court, if I could just finish that sentence, I know I've been going for a bit on this. But there are lots of cases on this court where in a mandamus or mandamus-like action, the defendant is just the agency. They didn't name the head of the agency. And this court has, you know, has, has issued the necessary relief to make that happen. All right, thank you. I'll give you two minutes for rebuttal. Do you have any, any additional questions for this one? All right. Thank you. Thank you. Thank you, Your Honor. All right, I think first up is Mr. Chadwick. Yes, Your Honor. Good morning. Joshua Chadwick on behalf of the Federal Reserve Board. Mr. Buchholz, who represents the Federal Reserve Bank of Kansas City, and I are going to endeavor to split our time in half here. So I will try to focus, what I'm going to talk about today, obviously subject to Your Honor's questions, is Section 248A. Before you get there, could you just respond on the mandamus question that we were just finishing up on? Sure, Your Honor. I think from the Board's perspective, I think you, you see this on this, it's correct to say that the Board does not believe that it's able to provide the relief here that they're seeking. So any relief that they're seeking would have to flow through the Reserve Bank. The KC, KC Fed has basically non-revealable discretionary power to deny a master account. Is that the Board of Governors perspective? Well, I'm not sure that it's our perspective that they have non-reviewable discretion. It is true that. Judicial, judicial review. Well, certainly there's, there's the issue of regulatory through the Board or congressional action, but separate and apart from that, I don't think it's our position that there's no claims that can be brought against the Federal Reserve Bank in this general sphere. It is true in other cases that the Reserve Banks, and the Board as well, have taken the position that they're not APA agencies. But they have a soon-be-sue clause. They do not claim sovereign immunity. So they're subject to all manner of other claims, common law, statutory, conceivably even constitutional claims, but they're not subject to arbitrary and capricious review under the APA. So that there really is no standard to review the denial of an applicant bank, is there? Well, Section 342 says may, so it's, it's clear that Congress granted broad discretion to the Reserve Banks in terms of of what account decisions they may make. If that were a Board decision, that would be a different circumstance. Congress structured the Federal Reserve in a very careful way to place Reserve Banks in a place that's separate and apart from the sovereign. They aren't federal agencies. But, but that doesn't mean that every action they take is not subject to some claims. They're being sued here. The claim that plaintiffs have brought is a statutory claim that says this duty is absolute. That seems like a incredible claim, frankly, but. It seems like your, your position is that you're a bit player, really a non-actor in this case, because all the action is with the KC Fed, and there's no action for the Board. And, you know, there's some evidence in the record of the collaboration by the, by the, by the Board and by the KC Fed. Should we, is that something that we should consider in evaluating the relationship between the two entities, or is, is, is the Board able to basically ask but not command the KC Fed to deny an account? Well, you know, I think the Board's role is clear from the record here, Your Honor. The Board established guidelines. It does have general supervisory authority. It promulgated guidelines for Reserve Banks to consider with the goal of having some level of consistency across the system without removing discretion that the Reserve Banks have always had since 1913 under the Federal Reserve Act. So, the actual role here for the Board is to ensure some level of consistency across its guidelines and to have insight into what's occurring around the system, but, but there's no, nowhere, I mean, the Board's own guidelines are clear that this decision rests with the Reserve Bank. Yeah, it's just advisory, right? The guidelines are advisory. That's correct, Your Honor. Yeah, I wanted to follow up about the, the guidelines. These guidelines were issued during the pendency of custodious application. Is that right? That's correct, Your Honor. So, I'm wondering how you would invite us to think about that fact when, you know, there, there have been maybe a few instances of master account denials, all very recent. There's a claim of absolute discretion, but no principles exercising that, no principles for, for guiding the exercise of that discretion until just now. So, it, you know, the, the facts on the ground could be understood as the guidelines are issued to seize discretion where there wasn't any before. Why shouldn't we be thinking about it that way? Well, a couple reasons, Your Honor. One, I would push back on the idea that there was nothing there in place before. I think the guidelines made some effort to bring some level of uniformity across the system, but I think Mr., Mr. Buchholz and the Reserve Bank brief makes quite clear that the individual Reserve Banks, whether it be Kansas City or New York, had these processes in place, and when the Board promulgated the guidelines, it made efforts to take into consideration these sorts of risk factors that have always been considered by the individual Reserve Banks. But on the timing question, I think it is true that if you look, starting with Fourth Corner, with this case, with Banco San Juan, with the narrow bank case out of New York, it is true that there's been a proliferation of novel charters that are presenting new and complex risk issues. So even though the Reserve Banks have always been assessing risk, the Board did determine that there was some value in bringing some level of consistency, at least in terms of the factors being considered, because of these, of these new and, and, and novel institutions. And yes, custody is one of them, but one of many, as these various cases show. How could, as Mr. Gershon-Shorn explained their business model, they're going to have their crypto account, and I'm using it that loosely, and their cash account. And how could, and, you know, the cash account is what they need access to the, to the master account for, for the bank services. How could that really introduce any significant risk into the system, if there's no overlap in those services? It just seemed, basically seems like a garden variety bank that has cash reserves of 100% of its deposits. I, you know, it seems like this would be less risky than other types of banks that have failed recently, Silicon Valley Bank, others. Why is there any risk attributable to this business model? Well, I will defer to Mr. Buchholz, Your Honor, on the risk factors of the Kansas City Reserve Bank considered, and what their decision was, because as I say, it wasn't. Well, you're, I think you're defending your guideline, your guidelines were applied properly, aren't you? We do think they were applied properly, Your Honor, but, but in terms of the factors that were considered, and there, and, and there were a lot, I mean, the level of diligence, you know, this, the services were available, generally, to custodians, the same way they're available, generally, to non-member banks, and have been, since Congress modified Section 342 in 1980, to give reserve banks authorization to accept the deposits, to offer, offer full service deposit accounts. The Reserve Bank went through a tremendous amount of diligence, tremendous amount of diligence. The amount of effort that was expended to, to analyze and assess the risks here is not insignificant, Your Honor, it's quite significant. How often have you revoked a master account? I don't have the date on it, Your Honor. It certainly has happened. It, it, you know, the Banco San Juan case is, is obviously a prime example. And are there standards for revocation? The guidelines apply both to new account requests and to revoked requests. So, whether or not, if a new institution comes, and there's concerns about money laundering, for example, at that stage, then the account could be rejected, because that's one type of risk, right? The, the individual reserve banks, the Federal Reserve, at large, cannot be co-opted into money laundering. And if, during the pendency of that account, if that's not a risk that's identified early on, if during the, the account relationship, the Reserve Bank determines that there is an unacceptable risk of money laundering through that institution, then they can revoke that account. The same standard would apply, Your Honor. Then, one other question. What, if any, impact should we give to the new regs that have just been adopted recently, I guess, on how these things will be regulated? On digital assets, Your Honor? Yeah. Well, it's an evolving space, Your Honor. I think that, as the regulatory landscape develops, as Congress may or may not take action, as the other banking agencies determine what is legally permissible or not for banks, which are closely regulated. Well, we're considering whether relief is needed. Can we take into account, not what existed at the time of trial or the rulings, but these new regs that have now been adopted, whether that ameliorated some of the, at least some of the risks that have been alleged? I don't think so, Your Honor, except I would say that these sorts of decisions... You don't think we can take them into account, or you don't think we should, or you think we should and could? I don't think you should. I don't think you should, and I don't think that you can. At least from the Board's perspective, this is an Administrative Procedure Act record review case. That information's not in the record. These denials, in this case, or the other account relationships, they're subject, they're non-prejudicial. So, an account holder or an entity that desires to hold an account can always come back and make a request based on the existing legal factual landscape as it exists at that time. And before you sit down, just the who who does the revocation would not be the Board or the Fed. It would be the regional bank. So, it'd be the KC Fed here in San Juan. It would have been the New York Fed. That's correct, Your Honor. And does the Board have any role in the revocation decision? The guidelines apply to the revocation decision as well, Your Honor. I know, but the Fed can't disagree with a regional bank's decision to either... I mean, let me just be clear. You have no supervisory legal authority to review the decision by the KC Fed to either grant or revoke a master account. That's correct, Your Honor. The Board could share its view and the President of the Reserve Bank could take their own counsel and do it. What if you had a Fed bank out there that's denying accounts for plainly impermissible reasons? We're going to deny master accounts for every black-owned bank. You have no power to direct them otherwise? I would say in that case, Your Honor, that the Board would remove the President of the Reserve Bank, which is an authority provided to the bank. But the Board would not permit that in that circumstance. You couldn't do anything about the master account, though. Say that again, Your Honor. You couldn't direct the Board President to grant a master account in those circumstances. You could only remove him or her. I think what the Board would say in that circumstance, Your Honor, is that's intolerable and unacceptable. And if you continue to do it, then you'll be removed. But for whatever persuasive power it had, though. No legal authority to direct it. Correct, Your Honor. Okay. Well, but when you can discharge a local bank, regional bank President, then does the Federal Reserve then have the power of appointing the replacement? The Board of Directors for the individual Reserve Bank, subject to the Board of Governors' approval, Your Honor. So the KC Fed would select its next president subject to the approval of the Board of Governors? That's correct, Your Honor. Thank you. Thank you. All right. We took a lot of your time, I presume, Mr. Buckholz. Could you... Howie, could you give seven minutes, please? Thank you, Your Honors. Good morning, Your Honors. May it please the Court, Jeffrey Buckholz for the Kansas City Reserve Bank. I'd like to try to cover four things in my time here, Your Honors, in response to the questions that you've already asked. First, Judge Timkovich, early on, you asked about the relationship between 342 and 248A, and then second, and I'll come back to that in a second, I just want to list the four things that I want to cover to make sure that they address the five Your Honors' lines. Thank you. Second, Judge Ebel and Judge Rossman, you both asked about questions about this idea that there's no history of discretion or whether we've disclaimed having discretion. I want to try to clarify that because I think that's really important. It's an important backdrop for this case. Third, Judge Rossman, you asked about the difference between outright admitted or adjudicated illegal conduct and risk, and I want to talk about that because I think that's really important to this case as well. And then fourth, a number of Your Honors have asked questions about whether discretion is unreviewable, whether there are avenues of judicial review, things like that. I want to address that as well, starting with the statute, 342 and 248A. Mr. Gershengorn began this morning by saying Congress in 248A mandated that all non-member banks who are eligible under the statute are entitled to access these services. That's actually not what 248A says, and the statute that's really controlling here, in our view, is 342. 342, for 115 years, has given reserve banks discretion about whether to receive deposits. It says may receive deposits. That language has not changed since 1913. In 1917, the class of people who the reserve banks were authorized but not required to receive deposits from was enlarged to include clearing accounts, not full-service deposit accounts, but check clearing accounts for non-members. And then in 1980, Congress enlarged that class further and gave reserve banks the authority to receive deposits from, for full-service basis, not limited to check clearing from non-member banks. But Congress preserved the may receive deposits language that the Supreme Court a hundred years ago authoritatively construed to give the reserve banks the discretion, but not the obligation, to receive deposits. The same question I asked your friend. Could the KC Fed grant the master account and then deny, under 248, and then deny deposits under 342? Well, it's your honor, I think that question points up the point that I'm trying to make here, which is it doesn't make any sense to adopt a holding that 248A absolutely entitles everyone who's eligible to a master account when 248A doesn't mention master accounts and isn't about accepting deposits. There's another statute for that, 342, which the Supreme Court has held gives reserve banks discretion, but not the obligation. Because yes, a reserve bank would have the discretion, we know this because the Supreme Court so held, to decline to accept deposits from a given entity that was eligible under 342 to make deposits. And so there's something wrong with the statutory interpretation that tries to jam into 248A, a rule that 248A doesn't enunciate and that would conflict with the Supreme Court's interpretation of 342. What 248A says is not that, I mean, it does contain the language shall be available to non-member banks, or it does contain that language, but what comes before that isn't reserve banks shall make these services available to all non-member banks. It's a pricing principle for the board. The whole statute is directed to the board, not to the reserve banks. If the KC Fed rejects or denies deposits under 342, is that decision judicially reviewable? So, Your Honor, I'm glad you asked that question because as I said in my introduction, I wanted to get to the reviewability issues. So we know, again, the Supreme Court has said that 342 gives reserve banks discretion. So, in general, the reserve banks would have the authority on their own to make that discretionary decision. But we have never claimed, in this case, and as far as I know no reserve bank has ever claimed, the absolute unreviewable discretion to refuse to accept the deposit for a legally impermissible reason. I mean, Your Honor asked about race discrimination. A reserve bank could not say we declined to accept deposits from blanks banks that are owned by black people because we don't like black people. That obviously would be impermissible. So, would it be impermissible under the statutory scheme or some other? I mean, I think here is your position that a plaintiff could sue and get mandamus against the KC Fed as a quasi private corporation, or there's no APA review here, is there? So, a couple answers there, Your Honor. First, the sort of technical issue about whether the mandamus statute applies, and then second, what the actual rule of law would be that would govern it, about whether the plaintiff in that case was entitled to relief. So, we have not argued in this case that the mandamus statute is not available to custodia. If custodia is right about their absolute entitlement theory, of course, we don't think they're right about that. But if they were, we've never argued that the court can't grant mandamus because they didn't name our president, they only named the bank. We could have said that below, or then they would have just amended their complaint and named the president as an additional defendant. Yeah, if we ruled against you, would the bank grant the master account? We might petition for cert first, Your Honor, and I'll gander. But yes, if the end result of this case is a holding that they're entitled to a master account, we've said loud and clear in our briefs, we'll give them a master account. There's no circumvention. There's no game-playing here. We're just trying to get the court to address the issue of law that they're not entitled to that as a matter of right. But back to Your Honor's question about, you know, a hypothetical where, of course, I don't think this would ever happen in real life, but if a reserve bank actually denied a master account, or did something else in the context of deciding whether to accept deposits, even after an account had been granted in the first place, for an invidious reason like racial discrimination, this case doesn't present any issue like that. So, you know, it's difficult to say in the abstract, but as Mr. Chadwick said, there are a variety of claims that somebody could bring in a situation like that. I mean, the reserve banks are not APA agencies in our view, and of course, Custodia abandoned the claim that the Kansas City Reserve Bank is an APA agency, so that's not before the court. But just because you're not an APA agency does not necessarily mean the Constitution doesn't apply to your conduct. The Constitution applies to a broader universe of actors than just APA agencies. So, in a situation like invidious discrimination on the basis of race, then the Constitution might well apply, and somebody might have a remedy, not under the APA, but under the Constitution. Let's leave the Constitution. Let's say the KC Fed is going to adopt a policy rejecting all crypto adjacent oriented banks. Just, you know, we're not going to give master accounts to any crypto bank. Could you do that? I think if a reserve bank had good reasons for exercising its discretion, just in saying that because of the business model, because of the... And how would those good reasons be reviewed? Well, it still seems to me, I thought your position was that you are not subject to judicial review for, I guess, non-invidious denials of master accounts. So, your honor, it's difficult for me to say in the abstract the total, the complete answer to what sort of claims somebody else could bring about a denial on different bases than an issue here. So, I hope, you know, I can answer your question as best I can. So, first, the Constitution might apply for the reasons we've talked about. Second, reserve banks have a sue-and-be-sued clause. They can be sued under state law. There's no sovereign immunity. So, there's no, this isn't like a case against the government where you have to think how does someone get into court in the first place? You can get into court against a reserve bank. And there could be state law claims in different situations. Of course, state law that conflicts with federal law is not valid. But, so, if a state law purported to say you don't have discretion where 342 says you do, well, then, you know, that wouldn't work. But, 342 doesn't, in our view, give us absolute under viewable discretion to make a decision for any reason, including an invidious one. So, depending on the facts, depending on the theory alleged, there could be avenues of judicial review. All I would emphasize here is that custodian has chosen, I think Judge Ebel, you made this point earlier, to rely only on this absolute entitlement theory. So, whether we have absolute discretion is not the issue here. Whether they have an absolute entitlement is the issue. We have not claimed to have absolute under viewable discretion. That question isn't before the court. All the court needs to decide here is they don't have an absolute entitlement. We have at least some discretion. And to get back to 342 and 248a and how they relate to each other, their position is that in a statute directed to the board, which can't and doesn't actually open accounts, that isn't about opening an account, that isn't about deposits, that Congress, just because it used the word shall be available to non-member banks, in a pricing principle, telling the board how to set prices for the services, that that overrides what the Supreme Court held 342 means. That's backwards, Your Honor. There's a statute that governs whether reserve banks can accept, can or have to accept deposits from non-member banks. The way you accept deposits is in a master account. Master account's just a sort of a fancy word for a deposit account, replacing a regime where you could have multiple deposit accounts at reserve banks. Now you have one, that's why they call it a master account, but it's just a deposit account. So there's no problem in 342 that doesn't use the words master account. We shouldn't be rereading anything from the absence of that language there. Correct, Your Honor. I don't think that matters. 342, again, dates back to 1913. The term master account is a newer term, but it's just a new term for an old thing. The thing is a deposit account. The deposit account has existed since the beginning of the Federal Reserve System. Who is eligible to deposit deposits into a deposit account has expanded over time. Initially, only members, then only members on a full service basis, but also non-members on a limited check clearing purpose basis, and then in 1980, non-members and members on an equal basis. But when Congress amended, when Congress enacted the Monetary Control Act and added 248A, it amended 342. So if Congress had wanted to say, now that we're opening non-members up on an equal basis to members for full service deposit accounts, we're going to make it mandatory, the place to do that would have been 342. Congress didn't forget 342 existed. Congress didn't forget 342 governed access to deposit accounts. It amended 342 in the Monetary Control Act. It expanded the class of people who the reserve banks had authority, but not the obligation to accept deposits from, and it preserved the may receive deposits language that the Supreme Court held provided discretion. That may be one of the arguments that really resonates with me, that this is a very odd place to put in a prescription eliminating discretion of the banks. I'm sure you've looked at all the legislative history, and you've given us everything there is out there on that, but it's just it's a very odd place for it. I agree, Your Honor. It's a backwards, indirect, unclear way of doing something that would be a very big deal. You're telling us now, you just said, that both the Monetary Control Act and the Federal Reserve Bank Act were being amended at exactly the same time? The Monetary Control Act amended the Federal Reserve Act. It added Section 248A, and it amended Section 342 at the same time in the same enactment, the Monetary Control Act. Okay, so to answer your Honor's question, and again, this goes back to the point I said that I wanted to address before about the sort of history or backdrop of the exercise of discretion or not. So, our briefs go through a number of examples of this, and so does the board's brief. Over time, from the beginning of the Federal Reserve System, where reserve banks thought that they had discretion about whether to accept deposits, whether to open an account. Of course, they didn't have any discretion to open regular, full-purpose deposit accounts for non-members until 1980, but the universe of actors who they had discretion, excuse me, who they had authority to open accounts for, accept deposits from, they thought that was discretionary. In the Supreme Court, you know, then so held in Farmers and Merchants. In the legislative history for the Monetary Control Act, and in all of the statements that my friend on the other side cites from the board or from reserve banks in the aftermath of the Monetary Control Act, yes, there are offhand references to now all depository institutions, not just members, have access to these services. There is not a single statement in the hundreds of pages of briefing in this case, not a single statement that anyone has been able to find ever, where a reserve bank or the board disclaimed having discretion to deny an account on the basis of risk. That has never happened. Under your theory of interpreting 342, can the Casey Fed deny master accounts to member banks? Yes. Yes, absolutely. I mean 342, again, we know because the Supreme Court so held, says you have discretion whether to accept deposits. The thing you accept deposits into now is called a master account. It used to just be called an account. It's the same thing. It just has a new name. And so, yes, if a member presented the kinds of risks that the Kansas City Reserve Bank found here without challenge by custodian on the merits, the custodian's request presented, then yes, a reserve bank could, and I think would, deny a master account to a member. So all that. Thank you, counsel. Go ahead and sum up, and then we'll give Mr. Gershenhorn some rebuttal. Thank you, Your Honor. The last thing I was just going to say is on the unreviewable discretion questions that Your Honors have asked. I understand that Your Honors have questions and concerns about the notion that reserve banks might have unreviewable discretion about whether to open accounts. Again, we haven't argued that reserve banks have unreviewable or absolute discretion about whether to open a master account. Custodia has chosen, in this case, to limit this case to an absolute entitlement theory. We have no discretion. So the exact contours or limits on the discretion that we have, or what avenues might be available to challenge this exercise, not presented here. You know, since you, since you mentioned it, then give me a hypothetical example of of a denial that we, we can and should review. Well, I think Your Honor's question earlier about... I.e. where your discretion could be challenged. I think Your Honor's question earlier about race discrimination or some other kind of invidious reason but we have never claimed the authority to make decisions on those kinds of a basis. And so if somebody actually, I don't think this would ever happen, and if somebody pleaded this, they might not plead it with adequate facts and it might not be a plausible claim. But if somebody actually pleaded a plausible claim of some kind of invidious discrimination in a master account decision, I don't think that would be unreviewable. I mean, I don't know because that's never been litigated. Whether reserve banks are subject to the Constitution, the Fifth Amendment's protections in that situation, you know, is a question of first impression. But I have difficulty personally believing there would be no avenue of review in that kind of a case. All right, counsel. Thank you. Appreciate your argument. Thank you very much, Your Honor. Two minutes, please, for rebuttal. Thank you, Your Honor. I'm gonna try to make four points, so I'll talk fast. First, on mandamus. I heard my, I heard Mr. Buchholz to agree that there is no mandamus problem with the claim that we are bringing. And so, you know, that seems, I hope the Court's concerns there are resolved. I will say this back-and-forth on unreviewable discretion seems to me astonishing given that they prevailed in Banco San Juan on the argument that they had unreviewable discretion to deny the Banco San Juan. Whether that was correct or not, like, for the Casey Fed to say they've never taken that position when they prevailed on the very argument that it was their unreviewable discretion is hard for me to understand. Are you arguing the separate defense of a judicial inconsistent statements? No, Your Honor, because we're not bringing that. I'm just saying, like, we're bringing a mandatory statutory duty claim. It's covered by mandamus. I heard Mr. Buchholz to agree with our position that mandamus or other relief is available against them. Second, Judge Rossman, you're exactly correct. What the guidelines were was a complete revisionist history. It was to seize discretion that didn't exist before. The idea that they had always been considering and assessing risk is impossible to reconcile with a one-page form that asked for their name, address, and contact information in 35 years. They never denied a single one. And the idea that novel banks are coming up for the first time in 2015 is preposterous. There were credit card banks, debit card banks, gift card banks. Thrifts were novel at the time. The idea that novel banks appeared for the first time in 2015 is preposterous. With respect just to Judge Ebell's question about legislative history, there is abundant legislative history that says Congress understood just what we thought. Mr. Buchholz was very careful to say there's no legislative history where we expressly disclaimed our authority. Fine, I'll concede that. But Chairman Volcker asked for open access. The Secretary of Treasury asked for universal access. The Comptroller of the Treasury asked for open access. The House report at page 20 says, and I quote, Pricing Principle 2 opens access to Fed services to non-member banks. This bill will ensure that a basic level of services is available to all banks throughout the country on a non-discriminatory basis. So the idea that the legislative history was silent on this is not accurate. And indeed, the idea that they're promulgating that this was somehow an elephant in a mouse hole is just, it denies history. The Monetary Control Act was a massive radical revision of the system. This was no mouse hole, right? Everybody understood there was a deal. The deal was everybody's subject to reserve requirements. In return, you get access to the basic systems that allow banks to compete and you get non-discriminatory pricing. Finally, substantively, they keep invoking the farmers case. Yes, when farmers was decided and 342 was there, the Fed and the Fed banks had discretion because Congress hadn't enacted 248C, which eliminated the discretion. The discretion you know is there is because 248C is not just a pricing principle. It says that shall be available except that members shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes. In other words, that provision only makes sense if Congress understood from the pricing principle that banks, real banks in the real world would be getting access. That's how they understood it for 35 years. And in conclusion, Your Honor, if I could just make this last point. I heard Mr. Chadwick say, and I thought it was super telling, that in response to questions about crypto, that we will keep doing this until, quote, we and other agencies decide what is and is not legal. I respectfully submit, Your Honor, that's exactly what is going on here. It was going on in the Coinbase case that Judge Peebus addressed. It's the Federal agencies stepping into a vacuum, finding new powers to egrep crypto that had never existed before. We urge the Court to adopt Judge Bachrach's opinion. Thank you, counsel. We appreciate the arguments. The case needed a little extra time, so I hope the other counsel were patient with us. Counsel, you're excused, and we'll take the case under submission.